NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

EDWARD LOGAN, et al., *Plaintiffs/Appellees*,

*v.*

JONATHAN WAGNER, *Defendant/Appellant*.

No. 1 CA-CV 20-0331
FILED 2-9-2021

Appeal from the Superior Court in Maricopa County
No. CV2020-005098
CV2020-005103
The Honorable Gary L. Popham, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Zawtocki Law Offices, PLLC, Mesa
By Marie S. Zawtocki
*Counsel for Plaintiffs/Appellees*

Jonathan Wagner, Mesa
*Defendant/Appellant*

_____

## MEMORANDUM DECISION

Judge Lawrence F. Winthrop delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Cynthia J. Bailey joined.

_____

**W I N T H R O P**, Judge:

**¶1**         Jonathan Wagner appeals two injunctions against harassment obtained by Edward Scot Logan ("Scot") and Edward Westley Logan ("Westley") (collectively, the "Logans"). Wagner argues the court erred in upholding the injunctions because his conduct did not rise to the level of harassment as defined in Arizona Revised Statutes ("A.R.S.") section 12-1809(S). For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

**¶2**         This case centers around a property located on McDowell Road (the "McDowell property" or the "property"), which is owned by the Logan Revocable Trust (the "Trust"). The trustee of the Trust was Lynne S. Logan, who was the mother of Scot and grandmother of Westley. A few years ago, Lynne moved from the McDowell property to live with Scot and Westley because of her declining health and inability to care for herself. In May 2018, Scot was granted power of attorney for Lynne, and later, Westley was also granted power of attorney for certain financial matters.

**¶3**         The parties in this case first met in August 2019 when Wagner went to Scot's home and inquired about renting or buying the McDowell property. Scot told Wagner he was not interested in selling or renting the property.

**¶4**         Wagner approached Scot at his home again on September 25, 2019, asking to rent or buy the McDowell property. At this time, Wagner represented to Scot that he had already been inside the house on the McDowell property, really loved the property, and wanted to buy it to fix up for his daughter. Scot again told Wagner he was not interested in selling or renting the property but would contact Wagner if he ever wanted to sell in the future. Scot also directed Wagner not to contact them anymore, nor come by their home, nor enter the McDowell property. In addition, Scot asked Wagner to refrain from speaking with Lynne and specifically informed Wagner that he and Westley had power of attorney for Lynne, so

2

any transaction regarding the McDowell property would need to go through them.[1]

¶5          Around a month later, Wagner phoned Scot's wife and began asking very specific questions about the Trust. Scot's wife told Wagner he should not be inquiring about their Trust and asked how he knew about it. Wagner claimed the information was "public record."

¶6          In March 2020, the Logans filed a police report alleging someone had trespassed on the McDowell property. Following this report, the police confirmed that there were "No Trespassing" signs posted in front of the property and assured that the front gate was chained shut.

¶7          On April 10, 2020, the Logans contacted the police again regarding suspicious activity at the McDowell property, explaining that someone had changed the locks on the property's front gate and mowed the lawn. Following this incident, Scot bought and installed new locks on the front gate.

¶8          Lynne passed away on April 12, 2020. At that time, Scot became the successor trustee for the Trust that owned the McDowell property. Following Lynne's passing, the Logans went to the property to gather and review boxes of Lynne's documents and other belongings that were stored there. At that time, the Logans found the porch lights on and an unknown truck and camper parked on the property. They also found that the new locks Scot had installed at the property had been cut and removed and a new barn-style gate had been installed. The Logans called the police, who checked and reported that no unknown persons were present on the property, and then called an impound company to remove the truck and camper.

¶9          Later that same day, Wagner showed up at the McDowell property, asking about his truck and stating he had been hired as a "trustee" for the property. The Logans and Wagner got into an argument,

---

[1]     On the same day, Wagner informed Scot that Westley's 1964 Jaguar Mark X car, which had previously been parked on the McDowell property and out of sight from the main road, was missing and then texted Scot a link to an online sale posting for the vehicle. Neither Scot nor Westley was able to find the online posting for the car by searching the sale website themselves; they could only find the posting through the link Wagner provided. The Logans filed a police report, and the car was later recovered by police at a scrap metal facility.

and Wagner rolled down his car window to show a large dog barking and snarling. The police were called, listened to statements from both sides, and eventually asked Wagner to leave the property. Following this incident, Wagner texted Scot that he would still be willing to buy the property and stated he had purchased an insurance policy on the house and had paid taxes on the property. Scot did not respond.

¶10 The next day, Scot saw a vehicle resembling Wagner's parked across the street from the McDowell property, and the vehicle drove off as Scot's family took pictures of it. Later that day, they realized that boxes of Lynne's titles, deeds, trust documents, and other records were missing from the house. Scot called the police to report the vehicle, at which point the police recommended the Logans get an injunction against harassment.

¶11 Scot and Westley each filed a petition for an *ex parte* injunction against harassment covering themselves and their spouses, and both petitions were granted. Wagner filed requests for a hearing to dispute the petitions. The court held a hearing for both matters on May 14, 2020, and heard testimony from Scot, Westley, and Wagner.

¶12 At the hearing, Wagner testified that on September 24, 2019, he met with Lynne, alone, on the front porch of Scot's home. He claimed that he and Lynne made a verbal agreement that he would rent the McDowell property for one year in exchange for cleaning and maintaining the property. Wagner stated he then contacted a licensed document preparer to draft a lease agreement. Wagner acknowledged at the hearing that no agreement was signed at the time of their September 24 meeting because he and Lynne "were to make additional changes to the lease" following their discussion. Wagner explained the additional changes included the option to buy the property after the one-year lease term expired and a clarification of who would pay insurance on the property. The written lease agreement obtained by Wagner was never signed by Lynne, and Wagner could not provide any documentation confirming he ever met her.[2] Wagner stated he took possession of the McDowell property once he confirmed that the "powers of the trustee" could not be conveyed by power of attorney, and thus concluded that the verbal lease agreement

---

[2] The court declined to admit into evidence an exhibit containing the written, unsigned lease document after concluding the document was "about the negotiations that defendant claims occurred that apparently didn't materialize into an actual lease agreement."

he had with Lynne was valid, despite Scot's repeated representations that the property was not for sale or rent.

¶13        The Logans testified they did not believe Lynne could or would have entered into an agreement with Wagner. Scot testified that when Wagner came to Scot's home on September 25—the day after Wagner's alleged meeting with Lynne—Lynne saw Wagner through the front window of the home and asked who the man was. Scot explained that although Lynne had dementia, she did not have trouble recognizing people at that point in time. But, Scot also testified that by August 2019, Lynne was "absolutely not" in a position to enter contractual agreements, which is why she had previously granted him power of attorney.

¶14        Westley agreed that Lynne could not have entered into any agreement without the family's knowledge and emphasized that she had nearly around-the-clock companion care due to her poor health. Westley testified that Lynne never mentioned Wagner and, even though Westley handled all of Lynne's bills and other financial documents, he had never seen any documents containing Wagner's name. Westley also explained that Lynne would not have agreed to rent out the property because she had consistently indicated she wanted to spend the end of her life there. In furtherance of that request, Westley was in the process of renovating the property so that he and his wife could live there with Lynne until she passed away.

¶15        Following the presentation of the evidence, the court found the Logans had provided sufficient evidence of harassment and upheld both injunctions. Wagner timely appealed the decision. We have jurisdiction pursuant to A.R.S. § 12-2101(A)(5)(b) and Arizona Rule of Protective Order Procedure 42(a)(2).

## ANALYSIS

### I.        *Sufficient Evidence of Harassment*

¶16        On appeal, Wagner argues the court erred in upholding the injunctions against harassment because his actions did not rise to the level of "harassment" as defined in A.R.S. § 12-1809(S).[3] He contends there could

---

3        We note that Wagner told the court below, "I would stipulate that there be an order against harassment to both parties." When the court asked him to clarify, Wagner reiterated, "I would stipulate to [an injunction against harassment] where I can't contact the—all four of those parties." Notwithstanding these representations, Wagner appealed the injunctions.

not be any harassment because there was "no direct physical confrontation" between himself and the Logans, only "polite" meetings. He also argues his actions were not harassment because they served a legitimate purpose: cleaning up and securing a vacant property from vandals.

**¶17**        We review an order granting an injunction against harassment for an abuse of discretion. *LaFaro v. Cahill*, 203 Ariz. 482, 485, ¶ 10 (App. 2002). We will reverse only if "the record, when viewed in the light most favorable to upholding the trial court's decision, is devoid of competent evidence to support the decision." *Savord v. Morton*, 235 Ariz. 256, 259, ¶ 10 (App. 2014).

**¶18**        A court shall issue an injunction against harassment if it "finds reasonable evidence of harassment of the plaintiff by the defendant during the year preceding the filing of the petition" for the injunction. A.R.S. § 12-1809(E). As applicable here, "harassment" means a "series of acts over any period of time that is directed at a specific person and that would cause a reasonable person to be seriously alarmed, annoyed or harassed and the conduct in fact seriously alarms, annoys or harasses the person and serves no legitimate purpose." A.R.S. § 12-1809(S).

**¶19**        Here, there was more than sufficient evidence to support the injunctions against harassment. The record shows Wagner contacted the Logan family multiple times about the McDowell property, despite Scot's clear statements that they were not interested in selling or renting the property and despite Scot's direction that Wagner stop contacting them. Further, despite Wagner being advised that, in light of the powers of attorney in place, any lease or sale concerning the property would have to be presented to and approved by Scot or Westley, Wagner persisted in creating and then relying on an unexecuted lease document to justify his trespass on the property. In addition, even though the property had multiple "No Trespassing" signs clearly posted, Wagner admitted he entered the property and took pictures inside the home before his conversation with Scot on September 25. After Scot asked Wagner to refrain from entering the property, Wagner still entered the property again, parked his vehicles there, changed the locks, and installed a gate. Wagner repeatedly involved himself in the Logan family's personal and financial affairs by acquiring deeds and tax history on the McDowell property, procuring information about the Trust, obtaining Scot's wife's phone number, purportedly securing an insurance policy on the property,

allegedly trying to pay taxes on the property, and claiming he was a "trustee" of the property.[4]

¶20        Harassment, as defined in A.R.S. § 12-1809(S), does not require a direct, physical confrontation between the parties. Further, although some of Wagner's actual actions (e.g., changing locks and installing new gates) or alleged actions (e.g., obtaining insurance and paying property taxes) could serve a legitimate purpose if he were authorized to conduct such acts, that is not the case here. The Logans testified that no one in the family had ever asked or authorized Wagner to pay the property taxes, obtain insurance, install gates, or enter the property at all. The record demonstrates that Wagner's actions could, and did, cause the Logans to be seriously alarmed. Wagner has not demonstrated the superior court abused its discretion in upholding the injunctions against harassment.

> II.        *Contractual Arguments*

¶21        Wagner also asserts two contract-based arguments to support the conclusion that he had a legal right to possess the McDowell property, and therefore his actions did not constitute harassment.[5]

---

[4]        Wagner testified he obtained an insurance policy from State Farm, but never produced it. He also submitted a proposed exhibit 15 purportedly showing delinquent taxes, plus a copy of a check payable to the Maricopa County Treasurer's Office, but the court declined to admit these documents based on a variety of grounds, including a lack of foundation.

In his petition seeking the injunction, Westley avowed under penalty of perjury that the taxes and property insurance were paid out of an escrow account by the lender holding the mortgage on the property and that there was no delinquency.

[5]        Wagner asserts that "this was not really a harassment case, it was a case about the right to possession and use of property." We disagree. This action concerns only the injunctions against harassment, and our review is limited accordingly. Wagner presented no documentary evidence at the hearing of a finalized lease agreement to demonstrate any right to access, let alone possess, the McDowell property. Any dispute over rights to the property or to enforce a contract can only be properly brought in a separate civil action in superior court; however, at the time of the hearing, Wagner had not commenced any such action.

**¶22** First, Wagner argues that the court erred in concluding he did not have an enforceable lease and contends that "in the absence of an executed agreement, a month to month lease is implied by law," citing A.R.S. § 33-1314(D). However, Wagner did not make this argument below; he only stated: "My understanding is that a verbal lease is valid in Arizona." Because Wagner did not adequately present this argument below, it is waived and we need not address it. *See Orfaly v. Tucson Symphony Soc'y*, 209 Ariz. 260, 265, ¶ 15 (App. 2004).

**¶23** Similarly, Wagner argues the court erred by failing to consider the doctrine of equitable estoppel concerning his purported lease. Again, this argument was not raised below, so we do not address it. *See id.*

        *III.    Attorneys' Fees*

**¶24** The Logans request their attorneys' fees and costs on appeal, pursuant to A.R.S. §§ 12-1809(O), -341, and -349. In our discretion, we award the Logans their reasonable attorneys' fees and costs upon compliance with Arizona Rule of Civil Appellate Procedure 21.

**CONCLUSION**

**¶25** For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA

8